## Case No. 12,357.

### SARCHET v. The GENERAL ISAAC DAVIS.

[Crabbe, 185; 1 Liv. Law Mag. 594.] [1]

District Court, E. D. Pennsylvania. Oct. 2, 1837, Jan. 27, 1838.

JUDGMENT — FOREIGN — RES JUDICATA — UPON MERITS—MARITIME LIENS—SUPPLIES —FOREIGN VESSEL.

1. It is perfectly settled that, under the constitution and laws of the United States, a judgment or decree, rendered in any of the United States, by a court of competent jurisdiction, between the same parties, on the same subject-matter, has all the force and effect, in any other state, of a domestic judgment.

2. A judgment for dismissal of a bill, in order to be a bar of a second suit, must have been ordered upon a hearing of the parties, or on the merits of the cause.

3. A dismissal for want of appearance is not a conclusive judgment.

4. Where a libel is dismissed, in one of the United States, for want of prosecution, such dismissal is not a bar of a subsequent proceeding, for the same cause of action, in another state.

5. Where a chain cable is loaned, by its maker, to a master, for the use of his vessel, under an agreement to be returned when another chain has been made and delivered on board; and, on such delivery of the second chain, the first is promised to be returned at a fixed time, before which the vessel sails, and the chain is never afterwards returned; the vessel is properly chargeable with the price of both chains.

6. By the general maritime law, a lien, for materials furnished, exists against foreign ships, and those of other states of the Union, which may be enforced in the admiralty independently of any bottomry bond.

[Cited in Thomas v. Osborn, 19 How. (60 U. S.) 28; The Rapid Transit, 11 Fed. 325.]

[1] [Reported by William H. Crabbe. Esq. 1 Liv. Law Mag. 594, contains only a partial report.]

[7. Cited in The Regulator, Case No. 11,660, to the point that no implied lien is created by the general maritime law, when the owner himself is present and makes the contract. In such case, the work and materials are presumed to be furnished, not on the credit of the vessel, but on that of the owner.]

This was a libel for materials. The libel was filed on the 7th August, 1837, and set forth that the libellant [John F. Sarchet] was a chain and anchor maker; that on the 8th December, 1833, he furnished two chain cables for the sloop [General Isaac Davis, Errixson, master], then at Philadelphia; that the price of them, as appeared by the schedule attached to the libel, was $188 15; that he had never obtained payment therefor; and concluding with the usual prayer for process. On the 17th August, Perry R. McNeill and John S. Lambdin filed an answer, stating themselves to be the owners of the sloop by recent purchase; that Errixson was no longer her master; that, since her purchase by them, she had made several voyages; that they were ignorant of all the transactions as stated in the libel; that on the 30th September, 1834, the libellant filed his libel against the sloop, in the district court of the United States for the Delaware district; that the said libel was filed for the same cause of action and for the same amount, with the exception of a charge of seventy-five cents for porterage; that the said court proceeded to hear and determine the matters in the said libel set forth, and decreed that the same should be dismissed; and these facts they pleaded in bar to the present libel. The libellant replied, that certain proceedings in admiralty had been instituted, in the district court of the United States for the Delaware district, against the said sloop by other parties; that by a decree of the said court therein, the said sloop was condemned to be sold; that the libellant authorized a proctor of said court to take measures to secure his claim on the proceeds of the sloop; that his said proctor filed a libel and took out process of attachment, proceedings on which were stayed; that no further steps were taken therein to his knowledge; that the libellant's said proctor had died long before the order of dismissal set forth in the respondents' plea in bar; that no new proctor was appointed; that the libellant had no notice of any further proceedings; and that he verily believed the said libel to have been dismissed for want of prosecution. To this the respondents demurred, on the ground that the decree of dismissal was the decree of a court of competent jurisdiction upon the same subject-matter, and, as such, could not be averred against or its regularity questioned or impeached, but that it should be received as final and conclusive. They also rejoined generally. A transcript of the proceedings in Delaware, properly authenticated, was affixed to the respondents' answer and plea in bar. It appeared from the transcript that a libel had been filed, for the same cause of

action, on 30th September, 1834; that process had been stayed thereon by order of the libellant's proctor; that on the 13th January, 1835, Isaas Davis, Esquire, of Smyrna, appeared in his proper person, gratis, claiming to be the owner of the sloop; that he consented that the cause should be proceeded in as if the process had been duly served, and the sloop delivered to him on his claim and stipulation, no objection to be made because Thomas Clark, named in the process, was not regularly a party on the record; and that he bound himself in $375 to abide and meet the result of the suit; that the suit was continued for nine terms; and that at June term, 1837, it was "ordered by the court, that the libel filed in that cause be dismissed, and that each party pay his own costs."

On the 22d September, 1837, the case came on before Judge HOPKINSON, upon the demurrer.

**Mr. Budd, for respondents.**

It is too late to attack the decree in Delaware; for, if there was any irregularity in that proceeding, the libellant might have taken a writ of error. Serg. Const. Law, 390–392; 2 Kent, Comm. 118–120; Harrod v. Barretto, 1 Hall, 155; Story, Confl. Laws, 494–502, 506 (sections 589, 590, et seq,); Penhallow v. Doane's Ex'rs, 3 Dall. [3 U. S.] 103; The Palmyra, 10 Wheat. [23 U. S.] 502.

**O. Hopkinson, for libellant.**

We do not impeach the validity of the decree in Delaware, so far as it goes; but it is not conclusive on us. To render it final, it must have been upon a hearing, or on the merits, which it was not. 2 Madd. 311; Pickett v. Loggon, 14 Ves. 232; Coop. Eq. Pl. 270, 290.

Mr. Emlen, on the same side, cited, to the same point, Brandlyn v. Ord, 1 Atk. 571; Harvey v. Richards [Case No. 6,182].

HOPKINSON, District Judge. The libellant alleges that in December, 1833, he furnished and delivered to the sloop General Isaac Davis two chain cables, for which he claims the sum of $188 15, as per an account annexed to his libel. An answer is put in by Perry R. McNeill and John S. Lambdin, claiming to be the owners of the sloop. After setting out their defence on the merits of the libellant's demand, the respondents further answer that on the 30th September, 1834, the libellant filed his libel in the district court of Delaware against the said sloop for the same amount now claimed, with the exception of seventy-five cents porterage, for certain iron chain cables alleged to have been furnished for the sloop; that the said libel was for the same matters and to the same effect as the libel in this court; and they further say that the said district court of Delaware did proceed to hear and determine the matters in

the said libel set forth, and decreed that the same should be dismissed, all of which appears by a copy of the proceedings annexed, and therefore they plead the said decree in bar of the libellant's libel. The libellant replies to this answer and plea by denials and averments against the matters alleged on the merits; and to the plea in bar he sets forth certain allegations to show that he had abandoned or stayed the proceedings on his libel in the district court of Delaware; that he was not actually or legally in court when the decree dismissing his libel was pronounced; that his proctor had died long before; that he had no knowledge of any of the proceedings in the suit after he had ordered the service of his process to be stayed; and that the said libel was dismissed for want of prosecution, without any examination or hearing of the merits. To this replication the respondents have demurred.

If the plea in bar is sufficient in law to conclude the libellant from a recovery in this case. it will be needless to go into the evidence or merits of the cause.

What is the effect of the decree in Delaware, as it appears on the record annexed to the answer? It is not the case of a foreign judgment, and it is therefore not necessary to examine the law upon the effect of such judgments. It is now perfectly settled that, under the constitution and laws of the United States, a judgment or decree, rendered in any of the United States, by a court of competent jurisdiction, between the same parties, on the same matter, has all the force and effect, in any other state, of a domestic judgment; that is, of a judgment rendered in a court of the same state in which the second suit is brought. Upon this question the cases decided in England should be attended to; and we may inquire what is the effect, there, of a prior judgment or decree upon a second suit brought for the same cause of action. The cases cited by the counsel for the libellant from 2 Madd. 311, 14 Ves. 232, Coop. Eq. Pl. 270, 290, and 1 Atk. 571, are clear and full to the principle that the judgment or dismissal of a bill pleaded in bar of a second suit must have been ordered upon a hearing of the parties, or the merits of the cause; and that a dismissal for want of appearance is not a conclusive judgment. In 1 Atk. 571, Brandlyn v. Ord,—a high authority,—the lord chancellor "laid it down as a rule, that when the defendants plead a former suit, that the court implied there was no title when they dismissed the bill is not sufficient; they must show it was res adjudicata, an absolute determination in the court that the plaintiff had no title." We must observe how directly this authority meets the argument of the respondents, which is, that although there is no direct allegation on the record that the cause was heard or determined on the merits, we must presume that it was so, or the court would not have dismissed the libel, and ordered each party to pay his own costs; that the

terms of the order or decree imply or import a hearing and decision on the merits.

Let us see if the law on this question, under the constitution and acts of congress of the United States, is different from what appears to be thus settled in the English courts. In Story, Confl. Laws, p. 506, the learned author, in sustaining the policy and reasonableness of the principle that foreign judgments should be conclusive, proceeds altogether on the ground that they have been rendered on the merits, and on the whole evidence. In speaking of the law, under the constitution and laws of the United States, as to the judicial proceedings, public acts, and records, of every other state, he says they are put upon the same footing as domestic judgments. In the same author's Commentaries on the Constitution of the United States, in volume 3, pp. 178, 179, he examines the constitution and acts of congress, and the decisions that have been made upon them, and maintains truly that more effect is to be given to the judgments in a sister state than to foreign judgments; that in confederate states, that in states united under one national government, a more favorable attention should be given to their judgments than to those of foreign states; that a higher security and confidence, a superior sanctity and conclusiveness, should be accorded to public acts and judicial proceedings under the authority of the federal individuals. With these broad and liberal views of the subject, with this disposition to give "full faith and credit" to the judicial proceedings of every state, he comes to this conclusion: "Under such circumstances, it could scarcely consist with the peace of society, or with the interest or security of individuals, with the public or with private good, that questions and titles, once deliberately tried and decided in one state, should be open to litigation again and again, as often as either of the parties, or their privies, should choose to remove from one jurisdiction to another. It would occasion infinite injustice, after such trial and decision, again to open and re-examine all the merits of the case." The same argument, and in nearly the same language, is found to be used by Judge Washington in the case of Green v. Sarmiento [Case No. 5,760]. In page 180 of the Commentaries, the author pursues the subject in the same strain of argument, always speaking of the evils of a re-examination of the judicial proceedings of each state. His conclusion as to the meaning of the clause of the constitution is that the "full faith and credit" to be given to records, &c., is to attribute to them absolute verity, so that they cannot be contradicted, or the truth of them denied, any more than in the state where they originated. In Wright v. Decklyne [Id. 18,076], Judge Washington says the decree of dismission is not conclusive. The rule, is admitted that the decision of a court of competent jurisdiction, directly upon the same point, is conclusive when the same point comes again

in controversy directly or collaterally. Other adjudications have been referred to, but it is not necessary further to examine them in detail; it is enough to refer to Wilson v. Speed, 3 Cranch [7 U. S.] 283; Hopkins v. Lee, 6 Wheat. [19 U. S.] 109; Harvey v. Richards [Case No. 6,182], and 1 Brown (Pa.) Append. 1.

It remains to look at the record now produced from the district court of Delaware, and I shall deny nothing, contradict nothing that it contains, but only inquire whether from that record it appears that the decree dismissing the libel from that court was made on a hearing of the parties, or on a fair and legal opportunity afforded to the libellant for a hearing, or an examination of the evidence and merits of the case, or indeed whether the contrary of this is not manifest from the record itself, and without taking into consideration the allegations of the libellant's replication; upon which I would however remark, that it is not in contradiction or denial of the record, but in direct answer to one of the allegations of the plea in bar.

In the first place, it must be observed that the plea expressly avers, after setting out that the libel filed in the district court of Delaware was for the same matters as the present libel, "that the said district court of the district of Delaware did proceed to hear and determine the matters in the said libel set forth, and decreed that the said libel should be dismissed, all of which appears by the copy of the record of the said proceedings hereunto annexed." If this allegation is maintained by the record and evidence referred to, that is, if it does appear by that record that the court did proceed to hear and determine the matters in the said libel set forth, then the respondent has maintained his plea in bar of the present suit, and will be entitled to a judgment accordingly; but if all this does not appear by the record, he seems to have admitted that he has failed to support his plea in an averment essential to its validity. The decree itself does not aver or purport to have been made after hearing, which is the usual form; nor is there in any part of the record any allegation, suggestion, or intimation that any such hearing was had, or any notice given to the libellant of the admission of a new party to the suit, not named or known in his libel, or of any of the proceedings of the new party, or of any motion or intention to ask of the court an order of dismissal of the libel, or of any other motion, order, or decree respecting the libel or the matters contained in it. Nor is there any decree or judgment rendered against the libellant upon the matters contained in his libel, and intended by that to be brought into controversy before the court. Nor was any answer filed to the libel, or any issue depending before the court, so that they could judicially know what were the matters in controversy, or render a decree thereon. The court knew nothing about the case, except that there was a libel which was

not prosecuted. Can we then fail to know, without relying on the allegations of the libellant's replication, that the dismissal of the libel must have been because the libellant did not appear to prosecute it? for there was nothing before the court but the libel upon which they could act, and they could act upon that only by dismissing it for a default of the libellant in prosecuting it, or on some objection to form which does not appear. No answer, no plea, no issue to bring the merits before the court; nothing which the court could, in the language of the plea in bar, "proceed to hear and determine." No evidence could have been heard, or trial had, in the state in which the case stood. There was nothing before the court to be tried. In the case of Gettings v. Burch, 9 Cranch [13 U. S.] 372, it was decided to be error in an orphans' court to decide a cause against the answer of the defendant, if the answer had not been denied by a replication, and if there be no evidence on the record contradicting the answer. The same principle would make it error in the court in Delaware to have decided this cause against the uncontradicted libel; as we must not presume error in the judgment of a court, we must say that the order or decree in this case did not intend to decide the matters contained in the libel, but merely to dismiss it for want of prosecution, that being the only order the court could legally make.

The libel in Delaware was filed against the vessel called the General Isaac Davis, and one Thomas Clark is stated to be the master and owner of the vessel. Process of attachment was ordered against the sloop, returnable on the 22d October, 1834; and on that day the marshal returned the process, stating that it was "stayed by order of George Reed, Esq., attorney for the plaintiff." So the case remained, the original process extinct by a return of it to the court, and no further proceeding against the vessel could have been had upon it. The libel only was in court, and if the libellant had desired to proceed with his suit he must have asked for new process, as the service of the first had been prevented by his own order, and the marshal having returned it could not have resumed or acted upon it. The case remained abandoned, or at least suspended, by the libellant, until the 13th January, 1835, nearly three months, when Isaac Davis, Esquire, who was not named or known in the libel, upon whom no summons or monition had been prayed or served; whose property, supposing him to have been the owner of the vessel, was under no restraint or attachment by process, comes in and claims to be the owner of the sloop "mentioned in the process aforesaid;" appears, as the record says, "gratis," that is, without any legal call or obligation upon him to do so, and claims to be the owner of the sloop; he consents that the cause shall proceed as if the process (which had not been served at all), had been duly served, and as if the vessel had been attached and afterwards delivered to him upon

his claim and stipulation (all of which was a pure fiction), and he also consents that he will make no objection because Thomas Clark, named in the record, is not regularly a party in the suit. This is all very extraordinary. Mr. Davis consents to all this. Now consent implies an agreement with some other party; with whom did Mr. Davis make this agreement? Not with the libellant, for he knew nothing of it, nor with Clark, for he was not in court. He consents that the name of Thomas Clark shall be expunged as a party to the suit, and that his name shall be substituted for that of Clark. But did the libellant ever consent to this? And could it be done without his consent, or an order of court on due notice, and hearing of both parties. Again, Mr. Davis, on the same system of acting on his own consent, and making agreements with himself, binds himself to Mr. Sarchet, in three hundred dollars, to pay whatever shall be decreed in the cause to be paid by the vessel. Now a stipulation of this kind, in a suit in rem, is taken as a substitute for the thing attached and in the custody of the law; but here nothing had been attached, nothing was in the custody of the law, there was nothing for which the stipulation was or could be a substitute. These things are adverted to, not as being irregularities to be corrected here, but as showing the nature of the whole transaction, and tending to the conclusion that the libellant was not heard on the merits of his case, nor had any opportunity to be heard, that he had no notice or knowledge of these steps, but that the whole proceeding was ex parte, and the libel dismissed without hearing, and with one of the parties only, in court; if we can consider Mr. Davis as a party in court after the extraordinary manner in which he put himself there. In the mean time, all the libellant knew of the suit, or any proceeding in it, was that he filed his libel; that he had put his process into the hands of the marshal, but had forbidden any proceeding upon it; and that his suit was against the sloop and her owner and master, one Thomas Clark. He was ignorant that a stranger to him and his process had come in "gratis;" had consented to put aside Thomas Clark, and placed himself as defendant in the suit; and that this stranger was proceeding to dismiss his libel, to be a bar to any future suit for the recovering of his debt. No notice was given to him of any of these proceedings. Can I hesitate to believe that the libellant, having stopped the service of his process and suffered the vessel to be at large, considered that his suit was abandoned, or required no further attention from him; or that it was possible he could suppose that a stranger could come in, without any notice to him or the original defendant, and carry on the suit to a termination. Isaac Davis, Esquire, having thus placed himself, "gratis," on the record as the defendant in the suit, remains at rest for eighteen months, that is from the 13th January, 1835, to June, 1837. In June, 1837,

still without any notice to the libellant; an order is given by the court that the libel be dismissed.

On this review of the proceedings in the court in Delaware, taken entirely from the record, it is manifest that the order for the dismissal of the libellant's libel in the court, was not a judgment or decree on the merits of the case, or after a hearing of the parties on any of the points in controversy between them, and therefore it is not conclusive upon the rights of the libellant. The demurrer is overruled, and the cause will proceed to be heard on the merits.

On the 13th January, 1838, the cause came on before Judge HOPKINSON, on the merits; and was argued by the same counsel as before. After the evidence—

O. Hopkinson, for libellant, urged:

1st, that the contract was made on the credit of the vessel. The General Smith, 4 Wheat. [17 U. S.] 443; The St. Jago de Cuba, 9 Wheat. [22 U. S.] 443; Abb. Shipp. 116 (148, Ed. 1846). 2d, that it was in evidence that the articles had been supplied according to the contract. 3d, that the vessel belonged to another state, and was liable to the lien. Act Cong. Dec. 31, 1792 (1 Story's Laws, 268 [1 Stat. 287]). 4th, that there was no evidence of any waiver of the lien or remedy, either express or implied.

Mr. Budd, for respondent.

Mr. Sarchet had security in Delaware, and relied upon that from 1834 to 1836, and waived all claim upon the vessel. The act of assembly of Pennsylvania ought to govern this case: that law relates to all vessels, foreign or domestic, and was the maritime law of Pennsylvania before this court came into existence.

Mr. Emlen, for libellant, in reply.

There is no doubt that the chains were delivered, and the price of them is not contested. The defence made is, 1st, that no lien exists, and, 2d, that, if it does, it has been waived. The lien is given by the general maritime law, the principles of which are not disputed; when a vessel is furnished with articles in a port to which she does not belong, and by the order of her master, the maritime law gives a lien upon her for the price of such articles. The waiver of this lien must be made out clearly on the part of those alleging it, which has not been done here. As to the security in Delaware, a stipulation to come in, answer, and abide by a judgment is not such a security as discharges a lien.

HOPKINSON, District Judge. The libel in this case is filed to recover the price of two chain cables furnished to the sloop General Isaac Davis in the months of November and December, 1833. In November the vessel was lying in the Schuylkill, under the command of John Errixson. She was built at Fred-erica, in the district of Delaware, where her owner, Thomas Clark, resided. The master applied to the libellant for a new cable for the sloop, and the libellant, not having a new one on hand, delivered to the master an old one, to be used until the new one could be made. Upon the delivery of the new chain, the old one was to be returned to the libellant. The new one was delivered, but the old one has never been returned, and both are now charged to the sloop, and she has been attached by the process of this court for the recovery of the value or price of both. At the time of the contract for these chains, and of their delivery on board the sloop, she was owned by one Thomas Clark. She has now passed, by regular sales, into the possession of the respondents, Perry R. McNeill and John V. Lambdin, who appear and take defence against the claim of the libellant. They allege that they purchased the sloop from Isaac Davis, on the 18th of February, 1837; that on the 15th of April, 1834, Thomas Clark, the first owner, sold her to Rhoda Hill and John Clark, who, in the same year, sold her to Isaac Davis. The answer then states the decree of the circuit court of the district of Delaware, which part of the defence has been passed upon by this court in a decision unfavorable to the respondents. Another defence, as to a part of the claim, has arisen upon the evidence, to wit, that the old cable was not purchased by the master of the sloop, but borrowed of the libellant, and, therefore, created no debt chargeable on the vessel; that by the agreement between the libellant and the master the old chain was to be returned by the latter and received by the former, and there was no contract of sale. In addition to these matters of fact, a question of law is presented upon the jurisdiction of the court, or, in other words, the existence of a lien on the vessel, for the payment of the claim is denied.

Upon the facts:

1. It is not to be doubted that these two chains were delivered on board of this sloop at the request of the master, who made the contract for them with the libellant, not only in virtue of his general authority as master, but by especial order of the owner. And no objection is made to the price.

2. As to the old chain, the facts are, that it was delivered by the libellant to Captain Errixson, for the use of the vessel until the new one should be ready for delivery, and that on the delivery of the new one, the old chain was to be returned to the libellant. The sloop made one or more voyages with the old chain; she then came into the Schuylkill, when the libellant sent her the new chain and demanded the return of the old one. It was not returned; the persons on board, under whose direction we are not informed, refused to give their assistance to the porter to put it on the dray, and it was not in his power to do it himself; the porter was told, however, that if it was sent for on

the next day it would be returned. The next day J. Sarchet went to the Schuylkill, but the vessel was gone with both chains, not even taking the care to put either of them on the wharf. From that day the libellant has never seen either of the chains, had any opportunity of getting the old one, nor had any offer to return it, with the exception of a conversation at Wilmington, in the month of June or July, 1834, between Thomas Clark and John Sarchet, when Clark says he offered to return it; but this offer was made after Clark had sold the sloop, and at a place—and, perhaps, after a lapse of time—when the libellant was not bound to receive it. I think, then, that the old chain is properly chargeable to the sloop, either as a conversion, by the owners, of the original loan into a sale, which may be inferred from their acts, or as damages for retaining and converting it to their own use.

3. The question of delay in bringing this suit has been made. Such delay ought not to be indefinite, especially in the case of new owners, but there has been no delay here that was not caused by the owner of the vessel, or the trade in which she was employed, taking her from place to place with but short stoppages at any of them. There is no proof that the libellant had any knowledge of her being at this port after she left it with his chains for the first time.

4. There remains the question of jurisdiction. The law in the courts of the United States is unquestionable that, in the language of Judge Story, "as to foreign ships, there seems to be no doubt, that by the general maritime law a lien exists for them, which may be enforced in the admiralty, independently of any bottomry bond." Such is the doctrine of the supreme court of the United States in the cases referred to at the bar; and a ship belonging to another state of the Union is deemed a foreign ship for this purpose. In Judge Story's last edition of Abbott, in a note on pages 115 and 116, the whole doctrine of liens in such cases is examined by the learned editor, and all the leading authorities cited.

In the libels filed and tried in the district and circuit courts of Delaware against this same vessel for certain work and materials furnished to her in this port, Chief Justice Taney gives a very clear and condensed view of the law of the case in full conformity with the doctrines of Judge Story, and it will probably be a satisfactory manner of examining the case now before us to take the opinion of the chief justice for our text, and apply it to the circumstances now in evidence. The libel and claim adjudged by the chief justice are stated by him to have been "to recover the amount due to the libellants respectively for work done, and materials furnished in rigging the sloop in the port of Philadelphia." From this general statement, as well as from other parts of the opinion it is manifest that the claim of the present libellant was not brought before that court or adjudicated by the decision given. The general facts of that case were substantially the same as they appear here; they are thus stated by the chief justice. "The sloop was built at Frederica, in the state of Delaware, where Thomas Clark, her then owner, resided. The hull was completed and launched about the last of July, 1833, and having neither masts nor sails, was towed" up to this city for the purpose of being here rigged. John Errixson, who was to be employed as her master, came in her to Philadelphia and remained here, giving directions while she was being rigged. But Clark, the owner, was also here during the whole time, and made the contracts for rigging her with the workmen and material men. In applying the legal principles of the chief justice to this case, we must particularly remark these two circumstances: (1) That the sloop came to this port in an incomplete state, without masts or rigging, for the purpose of procuring them and putting her in a condition to make voyages, and that coming here in this condition, and for this purpose, she could not in any sense be said in her passage from Frederica to Philadelphia to have sailed on a voyage from the one to the other port. It does not even appear that she had any crew on board, and as she was towed up, it was not likely she had any. (2) That the owner of the sloop was here the whole time the work was going on and the materials furnished, and made the contracts himself. It seems that the rigging was finished on Saturday evening, and on Sunday morning following, the sloop, with her owner and master, was gone, and proceeded to Wilmington, in the state of Delaware, without any payment being made to the workmen and material men. At Wilmington she was enrolled, and took a coasting license on the —— day of September, 1833, and then commenced her business or employment as a coasting vessel, sailing to and from Frederica, Philadelphia, and New York. These are the facts upon which the judgment of the circuit court in Delaware was given. The points of law decided are these: (1) That the libellants had lost the benefit of the lien given by the act of assembly of Pennsylvania. Of this there can be no doubt. The only ground, then, on which the libel could be supported was that an implied lien was created by the general maritime law. It is true, as the chief justice said, that the principles laid down by the supreme court in the case of The St. Jago de Cuba—9 Wheat. [22 U. S.] 416—must decide the point against the libellants. And why? Because in that case it was decided that the lien given by the general maritime law, is confined to contracts made by the ship master in a foreign port, in the absence of the owner, and that no lien is implied when the owner himself is present and makes the contract; and that in such a case the work and materials are presumed to be furnished, not on the credit of the vessel, but

on that of the owner. This was sufficient for dismissing the claim in Delaware, as the owner was present and himself made the contracts attempted to be enforced by an implied lien on the vessel. The chief justice having thus disposed of the case before him on undoubted principles of maritime law, none of which affect the case now to be decided, offers a remark upon the case of The General Smith,—4 Wheat. [17 U. S.] 438,—in which, he says, no distinction is taken between contracts made by the owner when the vessel is in a foreign port, or in the port of a state to which she does not belong. The chief justice confesses that the distinction is not very clear or satisfactory to him, but he adheres to it because it is expressly recognised in the case of The St. Jago de Cuba [supra]. The distinction alluded to is certainly established by other adjudications, going even so far as to say that when the owner has an agent with funds where the contracts are made and the work done, they are considered to be on the personal credit of the owner and not of the vessel.

The case in Delaware was, then, decided on the ground I have mentioned, but to prevent misapprehension of the opinion of the court in relation to other parts of the case, the chief justice proceeded to give his views or impressions of some of the circumstances, which are more immediately presented to our consideration. He says, "the court must not be understood to decide that there would have been the implied lien on the vessel if the contracts had been made by the master in the absence of the owner." He thinks "there would have been strong objections to it," for he doubted whether the mere hull, without masts and spars, and not documented by any custom-house, when at Philadelphia for the purpose of being finished as a vessel, would be said to have its legal home in Delaware, merely because Delaware was the home of the owner. Nor was he prepared to say that the rigging of a new vessel, in order to fit her for the first time for sea, comes within the views or language of the maritime law, which gives the lien to workmen and material men for repairs. I think the doubt is a reasonable one. But reasonable as this doubt is, it will not be found to affect the claim of the libellant in this case. A general reference to the evidence of this case will show not only how different it is from that decided in Delaware, but how entirely it is clear of the objections and doubts suggested by the chief justice in the conclusion of his decree.

1. The contract was made by the libellant with the master of the vessel, and not with the owner, nor was the owner present at the port at the time the contract was made and the cables furnished.

2. The vessel did not come to this port to be fitted out at the time the cables were supplied, but was fully and completely equipped and actually employed in the coasting trade for which she was designed, having before performed other similar voyages. Her fitting and equipment was completed in September, 1833, after which she was taken to the Delaware district, where her owner resided, and made voyages from and to that district, the chains in question not being furnished for a considerable time. They were contracted for in November, when the old chain was delivered, and the new one in the December following. The sloop was then taking in coal to go to New York, and was lying in the Schuylkill, where it is not pretended the original equipment was made.

3. The sloop was regularly documented, enrolled, and licensed as a coaster at the custom-house of the Delaware district. This was done at Wilmington, immediately on her return to Delaware, when her fitting out was completed, in September, and between that period and the months of November and December, she had been employed in her regular business voyages.

4. She did not get these cables for the first time, so as to take from the supply the character of repairs and give them the character of an original fitting out. It is clearly in proof that the first cables furnished to this sloop were purchased of one B. J. Pearson, and she had sailed with this chain, and the anchors got at the same time from the same person, from September until the others were obtained from the libellant.

In all these material points the case before us differs from that decided by the chief justice, and the lien claimed by the libellant is fully maintained by the principles of maritime law adopted by the chief justice in conformity with the settled doctrines of the supreme court as well as the English authorities.

Decree for the libellant for the sum of $188 15, but without interest.